FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 29 2007

JAMES N. HATTEN, CLERK
By: _____
Deputy Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA - ATLANTA DIVISION

| | | |
|---|---|---|
| LIFE RECEIVABLES IRELAND LIMITED | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GOSHAWK DEDICATED LTD., as the sole Member of Syndicate 102 at Lloyd's for the 2000 Underwriting Year of Account, and | ) | No. **1:07-CV-1541** |
| | ) | COMPLAINT FOR: |
| KITE DEDICATED LTD., f/k/a GOSHAWK DEDICATED (NO. 2) LTD., as the sole Member of Syndicate 102 at Lloyd's for the 2001-2003 Underwriting Years of Account, and | ) | 1. Securities Fraud<br>2. Common Law Fraud<br>3. Negligence<br>4. Conspiracy |
| CAVELL MANAGEMENT SERVICES LTD., as Managing Agent of Lloyd's Syndicate 102, and | ) | **JURY TRIAL DEMANDED** |
| CAVELL MANAGING AGENCY LTD., as Managing Agent of Lloyd's Syndicate 102, and | ) | |
| BABCOCK & BROWN INVESTMENT MANAGEMENT PARTNERS LP, and | ) | |
| BABCOCK & BROWN LP, and | ) | |

1

LIFE SETTLEMENT )
CORPORATION d/b/a )
PEACHTREE LIFE )
SETTLEMENTS, and )
)
SENIOR SETTLEMENTS )
HOLDING CORPORATION, and )
)
DOES 1-5 representing unknown )
individuals and/or entities )
operating through or as )
"LLOYD'S" )
)
         Defendants. )

## COMPLAINT

Plaintiff Life Receivables Ireland Limited, through its attorneys, complains as follows against Defendants:

## <u>NATURE OF ACTION</u>

This is an action for securities fraud, common law fraud, negligent misrepresentation, and conspiracy to commit fraud in connection with a $14.25 million transaction.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over the securities fraud claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C.A. § 78aa. This Court has supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same facts and circumstances as those giving rise to Plaintiff's securities fraud claims.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions occurred within this district and because one of the Defendants may be found in this judicial district. Further, three of the Defendants are currently availing themselves of the jurisdiction of this Court in pursuing claims related to the subject matter of this case more fully described below in lawsuits entitled *Goshawk Dedicated Ltd. v. American Viatical Services LLC*, 05 CV 2343 (N.D. Ga.) and *Goshawk Dedicated Ltd. v. Portsmouth Settlement Company I, Inc.*, 06 CV 0274 (N.D. Ga.).

3.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

3

## PARTIES

4.    Plaintiff Life Receivables Ireland Limited ("LR Ireland") is a private limited company formed under the laws of Ireland, with its principal place of business in Dublin.  On June 8, 2005, LR Ireland purchased a partnership interest in Life Receivables II, LLP ("LRII LLP"), a Delaware limited liability partnership, from Babcock & Brown Investment Management Partners LP and Senior Settlement Holding Corporation, or companies or entities they controlled, for $14.25 million.   LR Ireland's purchase of a partnership interest in LRII LLP is hereinafter referred to as the "June 8 Transaction."  By purchasing a partnership interest in LRII LLP, LR Ireland obtained an investment interest in the return realized by Life Receivables Trust ("LRT") on a fixed and closed portfolio of life insurance policies purchased for LRT from individual life insureds.  LRT's portfolio of life insurance policies was assembled by Babcock & Brown LP and Senior Settlements Holding Corporation, or entities controlled by them, for purposes of a future sale of an investment interest to an investor such as LR Ireland.

5.    Defendant Goshawk Dedicated Ltd. ("Goshawk Dedicated") is a limited liability corporation formed under the laws of England, with its

4

principal place of business in London.  Goshawk Dedicated was the sole member of Lloyd's Syndicate 102 for the 2000 year of account.

6.     Defendant Kite Dedicated Ltd., formerly known as Goshawk Dedicated (No. 2) Ltd., ("Kite") is a limited liability corporation formed under the laws of England, with its principal place of business in London. Kite was the sole member of Syndicate 102 for the 2001-2003 years of account.  (Goshawk Dedicated and Kite are hereinafter referred to collectively as "Goshawk.")  On or about October 30, 2003, Lloyd's announced that Goshawk was no longer allowed to accept new risks other than those that it was legally obligated to accept and also stated that Lloyd's would work closely with Goshawk to ensure an "orderly run-off of the business."

7.     Defendant Babcock & Brown Investment Management Partners LP ("BBIMP") is a Delaware limited partnership with its principal place of business in New York City, New York.

8.     Defendant Babcock & Brown LP ("B&B LP") is a Delaware limited partnership with its principal place of business in San Francisco, California.  BBIMP is a wholly owned subsidiary of B&B LP and B&B LP

5

controlled BBIMP with respect to the transactions discussed herein.  B&B LP and BBIMP are referred to collectively as "Babcock."

9.     Defendant Senior Settlements Holding Corporation ("Peachtree") is a Florida corporation with its principal place of business in Boynton Beach, Florida.  Peachtree is a wholly owned subsidiary of Peach Holdings LLC.  Peachtree and Babcock, or entities they control, were 100% owners of several entities involved in the transactions discussed herein including Life Receivables I, LLC and Life Receivables II, LLC.

10.     Defendant Life Settlement Corporation d/b/a Peachtree Life Settlements ("LSC/Peachtree") is a Georgia corporation with its principal place of business in Norcross, Georgia.  LSC/Peachtree is affiliated through common ownership and management with Peach Holdings LLC and is owned by companies constituting 77.5% ownership of Peach Holdings LLC. LSC/Peachtree acted as servicer and originator for LRT.  LRT at all relevant times has been the named assured under a series of contingent cost insurance policies ("the CCI Policies") underwritten and issued by Goshawk beginning in September 2000 through early 2003 and for  which Goshawk received premiums totaling millions of dollars.

6

11.    Defendant Cavell Managing Agency Ltd. is a registered corporation formed under the laws of England with its principal place of business in London.  Defendant Cavell Management Services Ltd. is a registered corporation formed under the laws of England with its principal place of business in London.  (Defendants Cavell Managing Agency Ltd. and Cavell Management Services Ltd. are referred to collectively as "Cavell.")  By no later than March 1, 2004, Cavell had been appointed by Lloyd's to manage the Goshawk run-off.  Robert Marsello ("Marsello"), an employee of Cavell, was personally responsible for managing matters related to the contingent cost insurance policies underwritten by Goshawk, including the CCI Polices issued for the benefit of the LRT portfolio.  At all relevant times, Marsello acted for and on behalf of Cavell and Goshawk.

12.    Does 1 through 5 are unknown individuals and/or entities operating through or as an entity identified as "Lloyd's" in the letter from Stephen L. McCann, "Head of Run-Off," dated May 17, 2004 and attached hereto as Exhibit A.  On information and belief, Does 1 though 5 are actively directing Cavell in managing the Goshawk run-off and managing the contingent cost insurance policies underwritten by Goshawk.

7

## FACTUAL ALLEGATIONS

A.   Preliminary Facts

13.   This action involves claims for damages for misrepresentations and omissions made in connection with the purchase and sale of a security, namely the partnership interest acquired by LR Ireland in LRII LLP in the June 8 Transaction.  Pursuant to the June 8 Transaction, LR Ireland paid $14.25 million for a partnership interest in LRII LLP, a Delaware limited liability partnership, by which LR Ireland obtained an investment interest in the returns realized by LRT on a fixed and closed portfolio of life insurance policies assembled for LRT by Babcock and Peachtree, or entities controlled by them, for purposes of a future sale of an investment interest to an investor such as LR Ireland.  The partnership interest acquired by LR Ireland in LRII LLP is an "investment contract" constituting a "security" under both the Securities Act and Exchange Act.

14.   LR Ireland is the victim of a fraud perpetrated collectively and individually by the Defendants arising from their joint and several conduct designed to induce lenders to provide the funds needed by Peachtree and Babcock to finance the purchase of assets for LRT and then to induce a third

8

party investor, such as LR Ireland, to acquire an investment interest in the returns generated by the LRT portfolio.

15.     By a trust agreement dated June 9, 2000 Peachtree and Babcock caused LRT to be formed for purposes of acquiring, holding, and selling interests in life insurance policies.  These life insurance policies were acquired from the insured policyholders for a price that was substantially less than the face value of the policies.  The discount in the price paid reflected, among other things, an estimate of each policyholder's life expectancy and the cost of maintaining each life insurance policy until the death of the insured person.

16.     Peachtree and Babcock required substantial financing -- more than $100 million -- to purchase life insurance policies for LRT, to pay themselves substantial fees for acquiring these policies and servicing them, to pay substantial premiums to Goshawk for the CCI Policies, and to pay premiums to the life insurance companies to maintain all purchased policies in effect until the insured individuals died.  Determining the maximum price to pay for any given life insurance policy was a critically important part of this business.  Finding persons willing to sell their life insurance policies and

negotiating price with them was of secondary importance but also essential to this business.

17.     Goshawk, whose business was insurance, assumed the actuarial responsibility for predicting life expectancies for persons willing to sell their life insurance policies if a mutually acceptable price could be negotiated. Goshawk thereafter guaranteed its actuarial life expectancy projections by assuming to itself the risk of the predicted life expectancies being wrong by more than two years.  It did so by issuing the CCI Policies, which obligated Goshawk to pay the full death benefit to LRT for persons still living on the first day of the third year beyond their actuarially predicted life expectancy ("LE+2").  Under those circumstances, Goshawk became responsible for continuing to pay premiums until the insured person died, at which time the death benefit would be paid by the life insurer to Goshawk.

18.     Due to the uncertainties of predicting death, this business was inherently speculative in character and largely dependent upon the actuarial skill of Goshawk and the negotiating skill of Peachtree and Babcock. Lenders providing the financing to support this joint undertaking of Goshawk, Peachtree, and Babcock, and the future investors to whom Babcock and Peachtree intended to sell their interests after the acquisition of

life insurance policies for the LRT portfolio was completed, necessarily would depend entirely upon the skills and efforts of Goshawk, Peachtree and Babcock to protect their interests and to secure the profits they were led by Defendants to expect.

19.    Given the critical importance of actuarial life expectancy projections not only to LRT's financial success, but also to its own, Goshawk required, as a condition to qualifying a life insurance policy for coverage under the CCI Policies, that actuarial life expectancy evaluations be performed on the insured individuals exclusively by its own hand-picked expert medical evaluation firms.  One such firm specifically denominated in the CCI Policies was American Viatical Services ("AVS"), located in Atlanta, Georgia, a firm which Goshawk had been using and endorsing since it first began underwriting this type of risk in January 1999.

20.    To further their joint efforts, and to induce lenders to provide operating cash to LRT and to guarantee to future investors the financial stability of this inherently speculative venture, Goshawk, Peachtree and Babcock specifically represented on the face of the CCI Policies, with the specific intent that these representations would be shown to and relied upon by lenders and future investors, that, with exceptions not relevant here:  (1)

11

Goshawk would always pay the full face value of the death benefit to LRT

for life insurance policies purchased from persons still living more than two

years beyond their predicted life expectancy ("LE+2") no matter what; (2)

neither lenders nor future investors would ever be affected by any possible

subsequent disputes between Goshawk, Peachtree, LSC/Peachtree and

Babcock over the accuracy of life expectancy evaluations or any other

possible issues; and (3) Goshawk's only recourse for disputes about the

accuracy of the life expectancy evaluations or any other issues would be

against LSC/Peachtree.

      21.    Defendants each knew that these representations on the face of

the CCI Policies were of vital importance not only to lenders but also to

future investors and intended that future investors, like LR Ireland, rely upon

them.  Among other things, the representations made it possible for lenders

and future investors to determine the point in time when the business of LRT

would be wound up, debt would be completely repaid, and profits would be

accounted for and paid out, namely, a date no later than two years after the

longest remaining life expectancy of any insured person (LE+2).  By then,

either all the life insureds would have died, or Goshawk would have paid the

full face value death benefit into LRT and assumed responsibility for all

remaining life insurance policies still in force.  In either case, the

representations in the CCI Policies assured both lenders and future investors,

including LR Ireland, that they would not be exposed to any risk that the LE

projections made by Goshawk through AVS might ultimately prove wrong

by more than two years.  As a result, Defendants expected and intended

future investors, including LR Ireland, to use LE+2 to compute their

minimum guaranteed return.

     22.    Pursuant to a Credit Agreement dated February 2, 2001,

following the issuance of the initial CCI policy to LRT, and based upon the

above representations, the initial lender, Abbey National Treasury Services

PLC ("Abbey"), advanced funds to Peachtree and Babcock, or entities they

controlled, to purchase life insurance policies for the LRT portfolio.

Goshawk, Peachtree and Babcock stood first in line and immediately took

substantial fees from LRT's loan-generated cash flow, with Peachtree and

Babcock receiving an "originating fee" and Goshawk receiving a "premium

fee" for each life insurance policy purchased.  In this way, Goshawk,

Peachtree and Babcock became immediate multi-million dollar beneficiaries

of the enterprise they had collaboratively formed. Through their joint efforts,

the cash payments received by Goshawk, Peachtree, and Babcock increased

13

as the value of the life insurance policies assembled for the LRT portfolio grew. Ultimately the amount drawn on the Abbey credit facilities to fund this joint enterprise, including the accrued interest and premiums due Abbey, exceeded $100 million.

23.    LRT was but one of several similar enterprises in which Goshawk and AVS have been involved in setting and insuring life expectancy evaluations dating back to early 1999. In each of these enterprises, Goshawk stood at the front of the line to take from the cash flow initially generated by lenders and investors.

24.    In October 2003, following heavy losses and findings of substantial mismanagement of Goshawk's underwriting operations, Lloyd's suspended Goshawk's underwriting activities, replaced its management with Cavell, and placed it in run-off. Thereafter, Cavell, acting through one of its principals, Marsello, and with the advice and assistance of as yet unknown others, most probably including Does 1 through 5 operating through or as "Lloyd's," adopted and embarked upon a scheme to disown Goshawk's obligations to LRT under the CCI Policies without regard to the consequences to existing or prospective lenders or innocent investors.

14

25.     By no later than November 2004, Cavell, Marsello and Goshawk had surreptitiously devised a run-off scheme for commuting Goshawk's obligations to LRT under the CCI Policies, as well as Goshawk's obligations in similar enterprises.  This scheme involved, among other things, (1) disavowing the representations concerning payment and non-recourse specifically made by Goshawk on the face of the CCI Policies for the benefit of lenders and future investors; (2) asserting that Goshawk had been fraudulently induced to issue the CCI Policies by "bogus" life expectancy evaluations and other misrepresentations by its own hand-picked medical evaluation firms, including AVS in Atlanta, Georgia; (3) claiming that Goshawk was entitled to rescission of the CCI Policies notwithstanding the representations made on their face concerning guaranteed payment to LRT and non-recourse against anyone except LSC/Peachtree; (4) adversely affecting the financial interests of innocent lenders and investors to maximize its negotiating leverage and increase the number of "deep pockets" involved in the dispute; and (5) thereafter attempting to force commutations of all outstanding CCI Policies by withholding payments of claims.  Later, as an integral part of this scheme, Cavell and Goshawk filed an action in this judicial district against their own medical evaluation firm,

15

AVS of Atlanta, Georgia, claiming that AVS had committed fraud in its life expectancy evaluations which had induced Goshawk into issuing several contingent cost insurance policies, including the CCI Policies covering the LRT portfolio.

26.    As will be described more fully below, at certain key times Marsello, acting on behalf of Goshawk and Cavell, made material misrepresentations and omissions about (a) the CCI Policies; (b) the specific representations made therein for the benefit of lenders and future investors; and (c) the scheme which had been devised by Cavell for Goshawk to commute the CCI Policies.  Moreover, Peachtree, LSC/Peachtree, Babcock and Marsello (acting for Goshawk and Cavell) failed to disclose before the June 8 Transaction facts concerning this scheme, including ongoing commutation negotiations, which were highly material to the securities transaction by which LR Ireland purchased its investment interest in the LRT portfolio.

B.    Contingent Cost Policies

27.    The CCI Policies cover life insurance policies acquired for LRT that are "Qualified Life Insurance Policies" as that term is defined in the CCI Policies.  A Qualified Life Insurance Policy is one that meets certain criteria

listed in the CCI Policies and includes, among other things, a life insurance policy wherein the Life Expectancy of the original insured is determined by a Qualified Physicians Report prepared by a Qualified Consulting Physician. The CCI Policies expressly delineated AVS as a Qualified Consulting Physician to set life expectancies for life insurance policies contemplated for purchase by Peachtree and Babcock, or entities they controlled, for the benefit of LRT.

28.     In fact, during the process of deciding to insure the risk associated with the LRT life insurance portfolio, Steve Mitchell -- the eventual underwriter of the CCI Policies -- and Paul Toomey, a senior underwriter at Goshawk, traveled to Atlanta, Georgia to meet with AVS regarding its life expectancy evaluations and calculations.

29.     The CCI Policies contain an unambiguous written representation that the policies will not be subject to a claim for rescission. Specifically, the CCI Policies[1] state:

> 2.   *Obligations Unconditional.*   Subject only to the section entitled **Contingency Insurance Premium** below, [Goshawk] agree[s] that each of their duty to accept for coverage any life insurance policy as to which

---

[1] Goshawk issued a series of CCI Policies insuring the life insurance policies acquired for LRT. This Complaint quotes from Policy Number CR10054. The other CCI Policies contain identical or substantially similar language as that quoted herein.

a Coverage Certification has been delivered and their obligation to pay the full and complete Net Death Benefit to the Assured by payment into the Collection Account or to the Loss Payee within the time period specified after delivery of a Claim Certification and an accompanying Effective Assignment (A) <u>is absolute, unconditional and irrevocable,</u> (B) shall not be affected by any change in the legal existence, structure or ownership of the Assured, the Servicer, the Back-Up Servicer, the Originator, or any of their respective members, beneficial holders or stockholders or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any such person or entity or any resulting release or discharge of any obligation of any such person or entity, and (C) <u>shall not be subject to any right of rescission, set-off, diminution or counterclaim or defense of any kind, including without limitation (i) fraud or misrepresentation by any person or entity.</u>

(CCI Policy at 16) (Italics and bold in original; underlining emphasis added) (hereinafter "No Rescission" representation).

30.     With exceptions not relevant here, the CCI Policies also contain an unambiguous representation that Goshawk's obligation to pay a claim is unconditional and absolute -- even if Goshawk had grounds to dispute the validity of a certain claim or the CCI policy itself.  The CCI Policies represent that, in the case of a dispute regarding a claim, Goshawk will first pay the claim, and only after the claim is paid will any dispute between Goshawk and LSC/Peachtree be referred to arbitration.  The CCI Policies state:

18

Each Claim Dispute will be promptly referred to arbitration in accordance with the applicable procedures set forth in the section entitled **Arbitration** below; provided, that any such Claim Dispute shall be automatically withdrawn in the event that the circumstances giving rise to such Claim Dispute have been cured by any Interested Person to the reasonable satisfaction of [Goshawk]; and provided, further, *that under no circumstances . . . shall [Goshawk] be entitled to submit any dispute as to [Goshawk's] obligation to pay a Claim under this Insurance to arbitration prior to payment of such Claim* as set forth in the section entitled **Claim Procedures**.

(*Id.* at 6) (Bold in original; underlining and italics emphasis added) (hereinafter the "Pay First" representation).

31.    The CCI Policies also contain an unambiguous representation that Goshawk's sole recourse is indemnification from LSC/Peachtree. Paragraph 3 of the Recourse section provides that LSC/Peachtree as Servicer and Originator of LRT "agree[s] to indemnify [Goshawk] against losses in respect of any Qualified Life Insurance Policy as to which [Goshawk] make[s] payment to the extent such losses result from the breach by the Servicer and the Originator of specified representations, warranties, covenants or provisions herein that materially and adversely affect the amounts realised as proceeds of such Qualified Life Insurance Policy." (*Id.* at 17.)  Paragraph 5 of that same section provides:

19

> *Sole Remedy*. Paragraph 3 of this section sets forth <u>the sole and exclusive remedy of [Goshawk] for losses arising out of, in relation to or in connection with any and all</u> . . . (ii) instances of fraud or misrepresentation committed by the Assured, the Servicer, the Originator or the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in connection with this Insurance, the Servicing Agreement or any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance.

(*Id.* at 18) (Italics in original; underlining emphasis added) (hereinafter "Non-Recourse" representation).

32.     Goshawk understood from the time the idea for CCI insurance coverage for life settlement portfolios like LRT was first brought to it in 1998 that the CCI policies had two principal purposes. First, they would be used to induce banks to lend huge sums to servicer / promoters like Peachtree and Babcock to buy life insurance policies and to pay themselves and Goshawk millions of dollars in fees and premiums. Second, they would be used to induce future investors, like LR Ireland, to rely upon the "hell or high water" payment obligations of Goshawk as guaranteeing a minimum rate of return on their investment.

33.     Goshawk directly, and through its captive underwriting agency, Merlin Underwriting Agency ("Merlin"), met with U.S. investment rating

agencies, such as Standard & Poors ("S&P"), to try to persuade them to

issue investment ratings on life settlement portfolios that purchased CCI

policies from Goshawk. If the rating agencies could be persuaded to issue

investment ratings on life settlement portfolios on the strength of Goshawk's

CCI policies, Goshawk stood to earn tens of millions of dollars in premium

income.

34.     Goshawk's efforts with U.S. rating agencies, however, faced

resistance. Unbeknown and never disclosed to LR Ireland prior to the June

8 Transaction, in 1999 or 2000, Goshawk met with representatives of S&P

in the United States. Present for Goshawk were Paul Toomey, one of its

senior underwriters, and Steve Mitchell of Merlin. In response to

Goshawk's efforts to persuade S&P to issue investment ratings on the

strength of Goshawk's CCI policies, the S&P representatives expressed

skepticism about the value of the Goshawk coverage. A senior member of

the S&P legal staff pointedly observed in the meeting with Goshawk that, in

his experience, when insurance company claims personnel complete their

training they are issued "claim denied" stamps.

35.     In direct response to this expression of skepticism from a S&P

legal staff member and similar resistance from other rating agencies,

Goshawk modified the terms of the CCI policies it issued to provide for the unconditional obligation to pay claims on covered life policies and to limit Goshawk's sole remedy to a claim against the servicer / promoter, such as Peachtree and Babcock.  The CCI Policies expressly limited Goshawk's remedy to a claim against LSC/Peachtree.

36.     Moreover, the CCI Policies explicitly acknowledge an expectation that future investors will in fact rely upon the representations made in the policies.  The CCI Policies provide that "it being understood and agreed that [Abbey together with its successors and assigns] *is relying upon the absolute and unconditional nature* of the obligations of [Goshawk] in entering into the Lending Transactions and providing financing thereunder." (CCI Policy at 17) (Emphasis added).

C.     Defendants' Fraud In Connection With The Sale Of A Security

**Transaction History**

37.     At all relevant times, Peachtree and Babcock, or entities they control, acquired life insurance policies from people willing to sell their life insurance policies.  For investment purposes, title to the policies was transferred directly from the sellers to LRT, a bankruptcy remote trust. Pursuant to a Receivables Sale Agreement, Peachtree and Babcock sold their

rights to the life insurance policies and their rights under the purchase agreements to Life Receivables I, LLC ("LRI"), an entity wholly owned by Peachtree and Babcock. Initially, all proceeds of LRT were allocated to an Undivided Trust Interest ("UTI"). LRI was issued a trust certificate evidencing its undivided beneficial interest in the assets of the UTI.

38. Thereafter, special units of beneficial interest ("SUBIs") in LRT were obtained by Life Receivables II, LLC ("LRII LLC"), another entity wholly owned by Peachtree and Babcock. Pursuant to the February 2, 2001 credit agreement, Peachtree and Babcock (through its wholly owned entity, LRII LLC) received "Term Loans" from Abbey in order to fund the purchase of the SUBIs. Peachtree and Babcock (through LRII LLC) then pledged the SUBI trust certificate to Bank of New York as collateral agent for Abbey. In connection with the June 8 Transaction, LRII LLC was converted into a limited liability partnership -- LRII LLP. LR Ireland purchased a partnership interest in LRII LLP by which it obtained an investment interest in the returns realized by the LRT portfolio.

39. Beginning in mid-2004 and continuing until the June 8 Transaction, while acting as a financial advisor to and representative of Allied Irish Bank ("AIB") and other prospective investors, Gerry Smyth of

International Investment & Underwriting ("IIU") performed due diligence regarding potential transactions involving the assumption of Abbey's loan to LRT, and the acquisition of an investment interest in the return realized by the LRT portfolio.

40.     The debt aspect of the transaction culminated on December 17, 2004, when Abbey assigned its rights as lender to AIB in exchange for $106,969,612.89.

41.     On the same date, LRII LLC, LSC/Peachtree, Settlement Funding LLC (another wholly owned subsidiary of Peach Holdings LLC), Peachtree and Babcock executed an "Undertaking Agreement" providing AIB an option ("the December Option") to purchase Peachtree's and Babcock's investment interest in the returns generated by the LRT portfolio. Specifically, AIB was granted the exclusive right and option through May 31, 2005 ("Exclusivity Lapse Date") to acquire Peachtree's and Babcock's interest for a price of $14,250,000.

42.     In the following months, Peachtree and Babcock actively continued to promote their interest in LRT to the potential investors represented by Mr. Smyth with the hope of realizing the benefit of AIB's exercise of the December Option.  Peachtree and Babcock communicated

24

almost daily with Mr. Smyth in furtherance of their efforts to induce AIB to exercise the December Option and acquire for itself, or a third-party investor, Peachtree's and Babcock's interest in the returns generated by the LRT portfolio.

43.    After AIB decided to use its December Option rights to place the Peachtree and Babcock interest in LRT with other investors, Mr. Smyth's employer, IIU, formed LR Ireland to acquire Peachtree's and Babcock's interest in LRT pursuant to AIB's rights under the December Option.

44.    On or about June 8, 2005, LR Ireland purchased a partnership interest in LRII LLP (formerly LRII LLC).  Pursuant to a partnership agreement dated June 8, 2005, LR Ireland obtained the right from Peachtree and Babcock, in exchange for $14,250,000, to 100% of the returns generated by the LRT portfolio after payment of the AIB loan and certain specified operational expenses.

45.    As all the Defendants expected and intended, the CCI Policies and the "Pay First," "No Rescission" and "Non-Recourse" representations on their face were of utmost materiality and importance to LR Ireland's investment decision.  Indeed, as Peachtree, Babcock and Marsello (acting on

behalf of Goshawk and Cavell) well knew, the validity of the CCI Policies and the guaranteed payment and non-recourse provisions were key items of the due diligence inquiry continuously performed by Mr. Smyth for the benefit of the potential lenders and investors he represented.

**Importance Of CCI Policies To June 8 Transaction**

46.     On or about September 7, 2004, during the due diligence investigation for the potential transaction between Abbey and AIB, Jim Vance, a principal at Babcock, discussed with Mr. Smyth the status of the CCI Policies.  Mr. Vance stated that Goshawk was in "run-off" but "its claims are being serviced of course, and Lloyds is still rated 'A'."  Further, Mr. Vance represented to Mr. Smyth that "[i]nformed observers still value the cover as backed by Lloyds."

47.     Thereafter, on or about October 27, 2004, Mr. Vance e-mailed contacts at AIB as well as Mr. Smyth and set out five possible areas of due diligence for the proposed AIB-Abbey transaction.  Area number two was the "Origination process" and included confirmation that all life insurance policies were "still current and valid and covered by Lloyd's policies."  As is clear, at all times before the relevant transactions, Peachtree and Babcock actively promoted the CCI Policies and their "Pay First," "No Rescission"

and "Non-Recourse" representations as a highly valuable element of an investment in the returns generated by the LRT portfolio.

48.     By no later than early November 2004, Peachtree and Babcock had made known their desire to sell their investment interest in the returns generated by the LRT portfolio.  Because the unconditional payment guarantee on the face of the CCI Policies combined with the non-recourse provision allowed prospective investors to calculate with precision a minimum guaranteed return on investment, Peachtree's and Babcock's investment interest in the returns generated by the LRT portfolio was an attractive potential investment to Mr. Smyth and his principals.

**November 2004 - Communications With Marsello, Cavell and Goshawk**

49.     In November 2004, while conducting further due diligence for the potential Abbey-AIB transaction, Mr. Smyth e-mailed Sergio Salani, a vice-president at both Peachtree and LSC/Peachtree, and notified him that he (on behalf of AIB and potential investors) needed to communicate with Goshawk representatives "to get a current position on the run-off and the backing of Lloyds."  Mr. Smyth noted that he had spoken to Marsello who required that he provide "authorisation of the Insured party (i.e. the trust)" before speaking further.  Mr. Smyth requested that Mr. Salani, on behalf of

27

LSC/Peachtree as servicer and originator of LRT, write a letter giving Marsello permission to speak with Mr. Smyth.

50.     On November 19, 2004 Mr. Salani, on behalf of LSC/Peachtree as servicer and originator of LRT, authorized Marsello to communicate with Mr. Smyth in connection with these critically important due diligence endeavors.  At that time both Mr. Salani and Marsello knew that the "Pay First," "No Rescission" and "Non-Recourse" representations on the face of the CCI Policies were being circulated and promoted to Mr. Smyth as a representative of a new lender and potential investors.

51.     Thus, by no later than November 19, 2004, Marsello (acting on behalf of Cavell and Goshawk) had been informed by LSC/Peachtree that Mr. Smyth was performing a due diligence investigation on behalf of parties considering acquiring the Abbey loan and Peachtree's and Babcock's investment interest in the returns generated by the LRT portfolio.  It was consistently understood by all Defendants that Mr. Smyth would be relying upon the effectiveness and validity of the CCI Policies and their "Pay First," "No Rescission" and "Non-Recourse" representations.

52.     On November 23, 2004, in a telephone call specifically arranged by Peachtree and Babcock for him with Marsello, Mr. Smyth

specifically asked:  (1) if the CCI Policies would be effective in all events; (2) what the overall financial situation was with Goshawk in run-off; and (3) what the recourse would be to Lloyd's if Goshawk were not able to pay. With certain knowledge that Mr. Smyth would rely on his answers to these questions, Marsello purposefully failed to disclose Cavell's and Goshawk's pre-determined scheme to resist claims and ultimately to commute the CCI Policies.  Instead, Marsello offered assurances to Mr. Smyth that even if Goshawk were financially unable to meet its obligations under the CCI Policies, Lloyd's would do so through its Central Fund.

53.    By letter dated November 23, 2004 and written as a follow up to questions orally posed earlier that day by Mr. Smyth in the telephone call arranged by Peachtree and Babcock, Marsello purposefully misled Mr. Smyth again into believing that there were no presently known circumstances adversely affecting what should be his complete confidence in the effectiveness and validity of the CCI Policies, when in fact the exact opposite was true.  As alleged in Paragraphs 24-26, Marsello (acting on behalf of Goshawk and Cavell and likely with Does 1 through 5) had already formed a run-off scheme to undermine the security provided by the CCI Policies by disowning the "Pay First," "No Rescission" and "Non-Recourse"

29

representations that had been made to lenders and investors.  Marsello at all times purposely withheld material information from Mr. Smyth concerning this run-off scheme.  Furthermore, Marsello then knew and intended that Mr. Smyth would continue to rely upon these misrepresentations and non-disclosures for as long as it took to consummate the acquisition of both the debt (from Abbey) and Peachtree's and Babcock's investment interest in the returns generated by the LRT portfolio.

**Cavell / Marsello Meetings With Tyser Special Risks**

54.     When Goshawk originally issued the CCI Policies the services of a Lloyd's broker, Tyser Special Risks ("Tyser"), were used.

55.     Three years later, shortly after assuming responsibility for managing the run-off of Goshawk's obligations under the CCI Policies and prior to Marsello's November 23, 2004 telephone conversation with Mr. Smyth, Marsello met with Brian Freeman, who had been one of the Tyser brokers initially involved in the placement of the CCI Policies for the LRT portfolio.  At that meeting with Mr. Freeman, Marsello declared that he knew of the fraud in the life settlement industry in the United States.  He advised Mr. Freeman that he wanted access to Tyser's files.  Based on Marsello's statements concerning fraud in the United States life settlement

industry, Mr. Freeman concluded that Marsello hoped to find evidence of

fraud in Tyser's files to bolster a refusal to pay claims on the CCI Policies.

**March 2005 - Marsello's, Cavell's and Goshawk's Attempted**

**Commutation**

56.    Unbeknown to Mr. Smyth or AIB, in March 2005, while

Peachtree and Babcock were attempting to realize the $14.25 million they

would receive upon AIB's exercise of the December Option, Marsello

traveled to the United States to meet with representatives of Peachtree,

Babcock and LSC/Peachtree in connection with his efforts to implement

Goshawk's and Cavell's run-off scheme for the CCI Policies.  At that

meeting, Marsello sought to obtain an agreement from Peachtree, Babcock

and LSC/Peachtree to commute the CCI Policies.  Based upon Marsello's

prior statements to Brian Freeman about fraud in the United States life

settlement industry, the information then available to Marsello concerning

the accuracy of AVS's LE predictions, and Marsello's subsequent actions,

LR Ireland is informed and believes that Marsello disclosed or, at a

minimum, implied Cavell's and Goshawk's position that the life expectances

provided by AVS were fraudulent in furtherance of the efforts of Goshawk,

Cavell, Marsello, and others to obtain a favorable buy-out of Goshawk's

obligations under the CCI Policies.  Because of the rights of AIB as lender and their continuing efforts to induce AIB to exercise the December Option, Peachtree, Babcock and LSC/Peachtree were neither able nor motivated to agree to a commutation of the CCI Policies.

57.    Thereafter, without ever disclosing the occurrence of this meeting or the disturbing topics discussed by the parties, Peachtree and Babcock continued to market an investment in the returns generated by the LRT portfolio to the parties on whose behalf Mr. Smyth was acting. Peachtree and Babcock continued in their attempts as if nothing had happened to adversely affect the CCI Policies or any of the representations contained in the CCI Policies about guaranteed payment by Goshawk to LRT and non-recourse against anyone but LSC/Peachtree.

58.    Well after the June 8 Transaction closed, on or about June 30, 2005, Mr. Smyth, still acting on behalf of LR Ireland and AIB, learned from Marsello that Cavell and Goshawk had attempted a commutation of the CCI Policies three months earlier.  Mr. Smyth thereafter inquired of Mr. Vance as to the details of the discussions.

59.    That same day, Vance responded that "[t]here have been discussions, in concept, about a Lloyds buy-out."  Vance asserted that

nothing ever became of Cavell's commutation proposal because the existence of the CCI Policies was a requirement of their "lenders." However, Peachtree and Babcock knew that if they had agreed to a commutation of the CCI Policies as Marsello proposed, the June 8 Transaction would never have occurred.  Peachtree and Babcock would accordingly have lost the $14.25 million that they hoped to gain on AIB's exercise of the December Option.

60.    By not disclosing their meeting and Marsello's efforts to obtain a commutation of the CCI Policies, Peachtree and Babcock fraudulently misled LR Ireland into purchasing their interests in the returns generated by the LRT portfolio.  Had LR Ireland known of this meeting and that a commutation of the CCI Policies had been sought, it would not have purchased Peachtree's and Babcock's interest in LRT.

**Run-Off Scheme Revealed**

61.    Upon information and belief, and unbeknown to LR Ireland before the June 8 Transaction, sometime in 2004 Marsello engaged the services of an actuarial firm to support the argument he wished to make that the life expectancies provided by AVS for LRT as well as for other similar programs were fraudulent.

62.     Thereafter, Marsello, acting on behalf of Cavell and Goshawk, set into motion a wider run-off scheme to deny legitimate claims not just for the CCI Policies but also for other similar programs.

63.     In July 2005, just weeks after the June 8 Transaction closed, LR Ireland learned that Cavell and Goshawk had denied a claim made by LRT under one of the CCI Policies which eventually forced LRT to commence an arbitration (the "Wang claim").  In August 2005, Cavell and Goshawk offered to return the premiums paid by LRT for the Wang claim.

64.     As disclosed in pleadings recently filed by Goshawk in related federal court proceedings in the Southern District of New York, Goshawk argued in the Wang claim arbitration that under New York law the "Pay First," "No Rescission" and "Non-Recourse" representations are invalid and unenforceable.  Specifically, Goshawk asserted that such representations are of no effect when the policy has been procured on the basis of fraud. Goshawk contends that the life expectancy evaluations submitted by AVS (which Goshawk itself had hand-picked) were fraudulent and, therefore, Goshawk is entitled to disregard the "Pay First," "No Rescission" and "Non-Recourse" representations contained in the CCI Policies.

65. The CCI Policies contain no exclusion for fraud or misrepresentation. In fact, when Goshawk, Peachtree, LSC/Peachtree and Babcock were negotiating the terms of the CCI Policies, Goshawk specifically agreed to delete a general exclusion for fraud and misrepresentation and agreed to limit its recourse solely to claims against LSC/Peachtree.

66. As previously alleged, Cavell and Goshawk are currently availing themselves of this Court's jurisdiction to pursue, in furtherance of the run-off scheme, fraud claims against AVS. In September 2005, Cavell and Goshawk filed a complaint against AVS in United States District Court for the Northern District of Georgia contending that, among other things, AVS committed fraud in its calculation of the life expectancy evaluations for the individuals insured by the policies in the LRT portfolio.

67. Cavell's actions demonstrate that it is pursuing a run-off scheme for Goshawk that takes advantage of innocent investors -- including LR Ireland -- in an effort to avoid Goshawk's contractual obligations and thereby minimize or entirely avoid claims against the Lloyd's Central Fund. Marsello, acting on behalf of Cavell and Goshawk, knew but did not disclose that Goshawk would contend that the representations made to

prospective lenders and future investors on the face of the CCI Policies were false when he discussed the CCI Policies with Mr. Smyth on November 23, 2004. Indeed, Marsello met with Peachtree, Babcock and LSC/Peachtree about a possible commutation of the CCI Policies only a few short months after Mr. Smyth first inquired about the CCI Policies and months before LR Ireland acquired its investment interest through the June 8 Transaction. By November 23, 2004, when he provided his assurances to Mr. Smyth, Marsello was on full notice of the supposed facts underlying Goshawk's assertions that the CCI Policies were induced by fraud. Marsello's assurances to Mr. Smyth about the CCI Policies were, therefore, false and misleading when made and failed to disclose material facts known to him.

**Material Misrepresentations and Omissions**

68.     Marsello's statements to Mr. Smyth -- both orally and confirmed in his November 23, 2004 letter -- that nothing affected the CCI Policies' ability to pay claims-- and his failure to disclose the run-off scheme were materially false and misleading. As Marsello knew and failed to disclose, Cavell and Goshawk were planning ways to ignore and disavow the representations that Goshawk made in the CCI Policies for the intended and expected reliance of future investors, such as LR Ireland, by engaging in

36

a run-off scheme that included denying valid claims and seeking to rescind the CCI Policies (despite the "No Rescission" representation) on the basis of purported fraud by a Qualified Consulting Physician hand selected by Goshawk. Specifically, Goshawk, Cavell, and Marsello already knew at that time that they would contend that the "Pay First," "No Rescission" and "Non-Recourse" representations were of no legal effect and that they did not intend to honor these representations when claims were made against the CCI Policies.

69.     Additionally, Peachtree, Babcock and/or Cavell failed to disclose prior to the June 8 Transaction the material fact that Marsello, acting on behalf of Goshawk and Cavell, attempted to commute the CCI Policies during Marsello's March 2005 meeting with Peachtree and Babcock. The failure to disclose this material fact was materially misleading.

70.     Specifically, Cavell, Goshawk, Peachtree, LSC/Peachtree and Babcock failed to disclose these material facts in spite of their knowledge that the existence, enforceability and smooth operation of the CCI Policies -- as well as the specific representations contained in the policies ("Pay First," "No Rescission" and "Non-Recourse") -- were fundamental to LR Ireland's

investment decision.  The CCI Policies in fact contemplated LR Ireland's reliance on the CCI Policies as a guarantee of minimum investment return. The CCI Policies *specifically acknowledged* that Abbey - and its successors and assigns (including subsequent investors in the beneficial interest like LR Ireland) - were "relying upon the ***absolute and unconditional*** nature of the obligations of [Goshawk] in entering into the Lending Transactions and providing financing thereunder."  (Emphasis added.)  Defendants' failure to disclose the attempted commutation of the CCI Policies was materially misleading.

### Specific Misrepresentations Contained On The Face Of The CCI Policies

71.    Alternatively, upon information and belief, the written statement of intent by Goshawk in the CCI Policies to honor the "No Rescission," "Pay First" and "Non-Recourse" representations contained in the CCI Policies was false when first made and was intended to induce unknowing third parties to invest in the returns generated by the LRT portfolio.

72.    Goshawk and, thereafter Cavell, knowingly and continuously allowed these false representations of intent on the face of the CCI Policies

38

to be circulated in connection with the intended and expected promotion of the LRT venture to future investors, including LR Ireland.

73.     Goshawk has now in fact contended that the "Pay First," "No Rescission" and "Non-Recourse" representations on the face of the CCI Policies are of no legal effect.  LR Ireland disputes Goshawk and Cavell's assertions in this regard and believes they are made in bad faith.  However, Goshawk knew at the time of the issuance of the CCI Policies that it had no intention of honoring these representations and that it would ultimately deny any obligation to do so.  As such, it made false statements that it knew would be promoted to and relied upon by lenders and future investors.  Further, Goshawk's and, thereafter Cavell's, failure to disclose this intention to repudiate the "Pay First," "No Rescission" and "Non-Recourse" representations in the CCI Policies on the grounds currently asserted by them constitutes a further failure to disclose a material fact.

74.     Goshawk has intentionally and/or recklessly allowed lenders and future investors, including LR Ireland, to rely upon the "Pay First," "No Rescission" and "Non-Recourse" representations on the face of the CCI Policies knowing that it either never intended to honor them or decided at some time before the June 8 Transaction not to honor them.  These

39

representations include:  the "Pay First" representation, the "No Rescission"

representation and the "Non-Recourse" representations.  Goshawk's

misrepresentations contained in the CCI Policies continued until after LR

Ireland relied on them in making its investment decision.

**Additional Scienter Allegations**

75.    As alleged, Defendants acted with scienter in that they knew

that their statements and omissions regarding the CCI Policies were

materially false and misleading and knew that such statements would be

relied on by potential investors, including those represented by Mr. Smyth,

in deciding whether to invest in the returns generated by the LRT portfolio.

76.    Defendants were motivated to engage in their scheme in order

to market LRT as an investment vehicle, thereby increasing the volume of

life insurance polices it could acquire and the fees and premiums paid

upfront to Peachtree, Babcock and Goshawk, which were based on a

substantial percentage of the face amount of the life insurance policies

acquired for LRT.  Goshawk was positioned to profit from its collection of

substantial premiums through this joint enterprise with Peachtree and

Babcock.  Peachtree and Babcock intended to profit a second time upon the

sale of an investment interest in the LRT portfolio to a future investor such as LR Ireland.

**Loss Causation**

77.    As a result of Defendants' false and misleading statements and their failure to disclose material facts, the value of LR Ireland's investment has been adversely affected and substantially diminished, all to its economic detriment. The payments which LR Ireland is entitled to receive as a partner in LRII LLP will be substantially less than they would have been if the representations made by Defendants in the CCI Policies and elsewhere as detailed in this Complaint had been true.

78.    Defendants' misrepresentations and failure to disclose material information regarding the CCI Policies and their availability to pay valid claims are the proximate cause of LR Ireland's losses.

**FIRST CLAIM FOR RELIEF**

**Violation of Exchange Act § 10(b) and Rule 10b-5 Against all Defendants**

79.    LR Ireland repeats and re-alleges each and every allegation contained in Paragraphs 1 through 78 above as if fully set forth herein.

80.    Defendants, individually and in concert with one another, violated § 10(b) of the Exchange Act and Rule 10b-5 by making untrue statements of material fact and failing to disclose material facts needed to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of a security.

81.    Defendants had actual knowledge of the misrepresentations and omissions of material facts described herein or acted with reckless disregard for the truth in that they failed to disclose such facts even though such facts were available to them.

82.    LR Ireland reasonably relied on the representations alleged herein and Defendants were aware of and have acknowledged the reasonableness of such reliance.

83.    Defendants' materially false and misleading statements and omissions caused the value of the partnership interest purchased by LR Ireland to be artificially inflated.  LR Ireland was damaged because it acquired its interest at an inflated price, and would not have purchased its interest in LRII LLP at the price it paid, if at all, if it had known of Defendants materially false and misleading statements or omissions.  When

the truth was revealed and/or materialized, the value of LR Ireland's interest in LRT declined dramatically, directly causing its losses.

## SECOND CLAIM FOR RELIEF

### Common Law Fraud Against All Defendants

84.    LR Ireland repeats and re-alleges each and every allegation contained in Paragraphs 1 through 78 above as if fully set forth herein.

85.    Defendants committed common law fraud by making untrue statements of material fact and failing to disclose material facts.

86.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.

87.    LR Ireland reasonably relied on the misrepresentations made by Defendants in deciding to purchase Peachtree's and Babcock's interest in LRT.  Defendants were aware of LR Ireland's reliance and have acknowledged the reasonableness of that reliance on the representations made by Defendants.

43

## THIRD CLAIM FOR RELIEF

### Negligent Misrepresentation Against All Defendants

88.     LR Ireland repeats and re-alleges each and every allegation contained in Paragraphs 1 through 78 above as if fully set forth herein.

89.     The Defendants negligently supplied false information and representations to lenders and investors, including LR Ireland.

90.     Specifically, the Defendants negligently supplied the CCI Policies -- and the "Pay First," "No Rescission" and "Non-Recourse" representations contained therein -- to LR Ireland in an effort to market and sell Peachtree's and Babcock's interest in LRT to LR Ireland.

91.     Marsello, acting on behalf of Goshawk and Cavell further negligently misrepresented that the CCI Policies were effective and available to pay claims for LE+2 policies.

92.     LR Ireland reasonably relied on such false representations when considering purchasing Peachtree and Babcock's interest in the return realized by the LRT portfolio.

93.     Defendants' misrepresentations regarding the terms of the CCI Policies and its availability to pay valid claims proximately caused significant financial losses to LR Ireland.

## FOURTH CLAIM FOR RELIEF

### Conspiracy To Commit Fraud

94.     LR Ireland repeats and re-alleges each and every allegation contained above in Paragraphs 1 through 78 as if fully set forth herein.

95.     Goshawk, Cavell, Peachtree and Babcock conspired to misrepresent and fail to disclose material facts regarding the enforceability and validity of the "Pay First," "No-Rescission" and "Non-Recourse" representations on the face of the CCI Policies on which LR Ireland relied in deciding to purchase Peachtree's and Babcock's interest in LRT.

96.     Goshawk, Cavell, Peachtree and Babcock stood to gain from the sale of the Peachtree's and Babcock's interest in LRT and agreed to intentionally misrepresent and fail to disclose Goshawk and Cavell's predetermined run-off scheme described herein.

97.     Goshawk, Cavell, Peachtree and Babcock's conspiracy continued up through the time LR Ireland purchased Peachtree's and Babcock's interest in LRT and continued until their misrepresentations and omissions began to emerge in 2005 and 2006.

PRAYER FOR RELIEF

WHEREFORE, plaintiff Life Receivables Ireland Limited prays for

judgment awarding it compensatory damages; punitive damages;

extraordinary, equitable or injunctive relief permitted by law or equity; pre-

and post-judgment interest; reasonable attorneys' fees; expert fees; other

costs; and such other relief as the Court may deem just and proper.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY.**

Dated:  June 29, 2007                    By:  _Betsy P. Collins_

One of the Attorneys for LIFE
RECEIVABLES IRELAND
LIMITED

OF COUNSEL:

John H. Mathias, Jr.                    Judson Graves
(Pro Hac Vice Application Pending)      Betsy P. Collins
Robert T. Markowski                     ALSTON & BIRD LLP
(Pro Hac Vice Application Pending)      One Atlantic Center
Megan A. Byrnes                         1201 West Peachtree Street
(Pro Hac Vice Application Pending)      Atlanta, GA 30309-3424
JENNER & BLOCK LLP                      Phone:  404-881-7000
330 North Wabash                        Fax:  404-881-7777
Chicago, IL 60611
Phone:  312-222-9350
Fax:  312-527-0484

Your ref:
Our ref:
Direct line:      020 7327 5984
Direct fax:       020 7327 6373
Email Address:    Steve.mccann@lloyds.com



17 May 2004

One Lime Street  London EC3M 7HA
Telephone 020 7327 1000
Facsimile 020 7626 2389
Web www.lloyds.com

To whom it may concern

Dear Sirs

## SYNDICATE 102

On 11 May 2004, Lloyd's granted permission to Cavell Managing Agency Ltd ("CMAL") to manage syndicate 102 in respect of the 2001, 2002 and 2003 years of account.  A Management Services Agreement is in place between CMAL and Cavell Management Services Ltd ("CMSL"), a Lloyd's approved run-off company, whereby CMSL provides run-off services to CMAL.

I confirm that Mr Robert Marsello at CMSL is responsible for Contingent Cost Insurance on syndicate 102.


Yours faithfully

Stephen.L.McCann
Head of Run-Off

Lloyd's is regulated by the Financial Services Authority

**EXHIBIT A**