# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| LIFE RECEIVABLES IRELAND LIMITED, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO.<br>: 1:07-CV-1541-RWS |
| GOSHAWK DEDICATED LTD., et al., | : |
| Defendants. | : |

## **ORDER**

This case comes before the Court for consideration of Defendants Babcock & Brown Investment Management Partners LP's and Babcock & Brown LP's ("Babcock") Motion to Dismiss, or in the alternative, Motion for More Definite Statement [20] and Life Settlements Corporation d/b/a Peachtree Life Settlements' ("Peachtree") and Senior Settlement Holding Corporation's ("SSHC") Motion to Dismiss [29].[1]  After a review of the record, the Court enters the following Order.

---

[1] The Court finds that the following motions are moot as a result of the Voluntary Dismissal [121] of the relevant parties: Motion to Dismiss for Lack of Subject Matter Jurisdiction [23], Motions to Dismiss for Failure to State a Claim [25] and [26], Motion for Antisuit Injunction [40], and Motions for Leave to File [77] and [78].

I. **Background**[2]

By a Trust Agreement dated June 9, 2000, SSHC and Babcock caused Life Receivables Trust ("LRT") to be formed for the purpose of acquiring, holding, and selling interests in life insurance policies. (Complaint [1] at ¶ 15.) These life insurance policies were acquired from the policy holders for a price substantially less than the face value of the policies. (Id.) The discount in the price paid reflected, among other things, an estimate of each policy holder's life expectancy and the cost of maintaining each life insurance policy until the death of the insured person.

Goshawk Dedicated Limited ("Goshawk"), an insurance business, assumed the actuarial responsibility for predicting life expectancies for persons who were willing to sell their life insurance policies. (Id. at ¶ 17.) Goshawk guaranteed its actuarial life expectancy projections by assuming the risk of the predicted life expectancies being wrong by more than two (2) years. (Id.) Goshawk issued contingent cost insurance policies (the "CCI Policies") which obligated Goshawk to pay the full death benefit to LRT for persons still living on the first day of the third year beyond their actuarially predicted life

---

[2]The Background is based on allegations in the Complaint [1].

expectancy. (Id.)  Under those circumstances, Goshawk became responsible for continuing to pay premiums until the insured person died, at which time the death benefit would be paid by the life insurer to Goshawk.  (Id.)

Because of the importance of the actuarial life expectancy projections, Goshawk required that the actuarial life expectancy evaluations be performed on the insured individuals exclusively by its own hand-picked expert medical evaluation firms.  (Id. at ¶ 19.)  One such firm specifically denominated in the CCI Policies was American Viatical Services ("AVS").  (Id.)  To induce lenders to provide operating cash to LRT and to guarantee future investors the financial stability of this venture, Goshawk, SSHC, and Babcock represented on the face of the CCI Policies, with the specific intent that the representations would be shown to and relied upon by lenders and future investors, that, with exceptions not relevant here:

(1) Goshawk would always pay the full face value of the death benefit to LRT for life insurance policies purchased from persons still living more than two (2) years beyond their predicted life expectancy ("LE+2") no matter what;

(2) Neither lenders nor future investors would ever be affected by any possible subsequent disputes between Goshawk, Peachtree, LSC/Peachtree and Babcock over the accuracy of life expectancy evaluations or any other possible issue; and

3

>    (3) Goshawk's only recourse for disputes about the accuracy of the life expectancy evaluations or any other issues would be against LSC/Peachtree.

(Id. at ¶ 20.) Defendants knew that these representations were of vital importance to future investors and would be relied upon by them. (Id. at ¶ 21.)

Pursuant to a Credit Agreement dated February 2, 2001, Abbey National Treasury Services PLC ("Abbey") advanced funds to SSHC and Babcock to purchase life insurance policies for the LRT portfolio. (Id. at ¶ 22.) Goshawk, Peachtree and Babcock took substantial fees from the loan-generated cash flow. (Id.)

In October 2003, following heavy losses and findings of substantial mismanagement of Goshawk's underwriting operations, Lloyds of London ("Lloyd's") suspended Goshawk's underwriting activities, replaced its management with Cavell Management Services Ltd. and Cavell Managing Agency, Ltd. (collectively "Cavell") and placed it in run-off. (Id. at ¶ 24.) Thereafter, Cavell, acting through one of its principals, Robert Marsello ("Marsello"), adopted and embarked upon a scheme to disown Goshawk's obligations to LRT under the CCI Policies. (Id.)

4

By November 2004, Cavell, Marsello, and Goshawk had devised a run-off scheme for commuting Goshawk's obligations to LRT under the CCI Policies. (Id. at ¶ 25.) The scheme involved, among other things, asserting that Goshawk had been fraudulently induced to issue the CCI Policies by bogus life expectancy evaluations by the medical evaluation firms, including AVS. (Id.) The scheme also involved attempting to force commutations of all outstanding CCI Policies by withholding payments of claims. (Id.) As an integral part of the scheme, Cavell and Goshawk filed an action against AVS in this Court alleging that AVS committed fraud in its life expectancy evaluations. (Id.)

To assist in attracting investors, Goshawk met with United States investment rating agencies, such as Standard & Poors ("S&P") to try to persuade them to issue investment ratings on life settlement portfolios that purchased CCI Policies from Goshawk. (Id. at ¶ 33.) Goshawk met with representatives of S&P in 1999 or 2000. (Id. at ¶ 34.) The S&P representatives expressed skepticism about the value of the Goshawk coverage. (Id.) In response to the skepticism from S&P, Goshawk modified the terms of the CCI Policies to provide for the unconditional obligation to pay claims on covered life policies and to limit Goshawk's sole remedy to a claim against the

5

servicer/promoter, such as Peachtree and Babcock.[3] (Id. at ¶ 35.) The CCI Policies expressly limited Goshawk's remedy to a claim against Peachtree. (Id.)

As SSHC and Babcock acquired life insurance policies, title to the policies were transferred directly to LRT. SSHC and Babcock sold their rights to the policies to Life Receivables I, LLC ("LRI"), an entity wholly owned by SSHC and Babcock. Thereafter, special units of beneficial interests in LRT were obtained by Life Receivables II, LLC ("LRII LLC"), another entity wholly owned by SSHC and Babcock. LRII LLC was converted into a limited liability partnership-LRII LLP (Id. at ¶ 38.)

Beginning in mid-2004 and continuing until LR Ireland's purchase of the partnership interest in LRII LLP on June 8 (the "June 8 Transaction"), Gerry Smyth ("Smyth") of International Investment and Underwriting ("IIU"), while acting as a financial advisor to and representative of Allied Irish Bank ("AIB")

---

[3]In its Response to Babcock's Motion to Dismiss, Plaintiff argues that Babcock and SSHC worked with Goshawk to modify the terms of the CCI Policies following expressed concern by the S&P. (Dkt. No. [43] at 7.) While Plaintiff alleges such actions in its Response, the Complaint is silent about the participation of Babcock and SSHC in these actions, and rather names only Goshawk's involvement.(Complaint 33-35.) Accordingly, the Court disregards these contentions related to Babcock and SSHC in its analysis.

6

performed due diligence regarding potential transactions involving the assumption of Abbey's loan to LRT and the acquisition of an investment interest in the return realized by the LRT Portfolio. (Id. at ¶ 39.) On September 7, 2004, during Smyth's due diligence investigation, Jim Vance, principal at Babcock, discussed with Smyth the status of the CCI Policies. Vance stated that Goshawk was in run-off, but "its claims are being serviced of course, and Lloyd's is still rated 'A.'" (Id. at ¶ 46.) Vance also represented to Smyth that "informed observers still value the cover as backed by Lloyd's." (Id.)

On October 27, 2004, Vance emailed contacts at AIB as well as Smyth and set out five (5) possible areas of due diligence. (Id. at ¶ 47.) One of the areas named by Vance was the "Origination process," including confirmation that all life insurance policies were "still current and valid and covered by Lloyd's policies." (Id.)

In November 2004, while conducting other due diligence, Smyth emailed Sergio Salani, a vice-president at Peachtree and SSHC, and notified him that he needed to communicate with Goshawk representatives "to get a current position on the run-off and backing of Lloyd's." (Id. at ¶ 49.) Smyth was seeking the "authorisation of the insured party" as required by Marsello before Marsello

7

would speak to him concerning the matter.  (Id.)  On November 19, 2004, Salani, on behalf of Peachtree, authorized Marsello to communicate with Smyth in connection with the due diligence endeavors.  (Id. at ¶ 5.)

On November 23, 2004, in a telephone call arranged by SSHC and Babcock for him with Marsello, Smyth specifically asked: "(1) if the CCI Policies would be effective in all events; (2) what the overall financial situation was with Goshawk in run-off; and (3) what the recourse would be to Lloyd's if Goshawk were not able to pay."  (Id. at ¶ 52.)  Marsello failed to disclose Cavell's and Goshawk's scheme to resist claims and commute the CCI Policies and offered assurances that even if Goshawk were financially unable to meet its obligations under the CCI Policies, Lloyd's would do so through its Central Fund. (Id.)  Plaintiff alleges that Marsello purposely withheld information from Smyth intending that Smyth would rely on the misrepresentations and non-disclosures.  (Id. at ¶ 53.)

On December 17, 2004, Abbey assigned its rights as lender to AIB in exchange for $106,969.612.89.  On the same date, LRII LLC, Peachtree, SSHC, and Babcock executed an "Undertaking Agreement" providing AIB an option to purchase SSHC and Babcock's investment interests in the returns generated by

8

the LRT Portfolio.  (Id. at ¶ 41.)  AIB was granted the exclusive right and option through May 31, 2005 to acquire SSHC and Babcock's interest for a price of $14,250,000.  (Id.)

In March 2005, Marsello met with representatives of SSHC, Peachtree, and Babcock. (Id. at ¶ 56.)  At the meeting, Marsello sought to obtain an agreement from SSHC, Peachtree, and Babcock to commute the CCI Policies.  (Id.)  Plaintiff alleges, on information and belief, "that Marsello disclosed or, at a minimum, implied Cavell's and Goshawk's position that the life expectances [sic] provided by AVS were fraudulent in furtherance of the efforts of Goshawk, Cavell, Marsello, and others to obtain a favorable buy-out of Goshawk's obligations under the CCI Policies."  (Id.)  SSHC, Peachtree, and Babcock did not agree to a commutation of the CCI Policies.  (Id.)  SSHC and Babcock continued to market an investment in the returns generated by the LRT Portfolio without disclosing the occurrence of the meeting or the topics discussed.  (Id. at ¶ 57.)

SSHC and Babcock communicated almost daily with Smyth in furtherance of their efforts to induce AIB to exercise the aforementioned option. (Id. at ¶ 42.)  After AIB decided to use the option rights to place the SSHC and

9

Babcock interest in LRT with other investors, Smyth's employer, IIU, formed LR Ireland to acquire SSHC and Babcock's interest in LRT pursuant to AIB's rights to the option.  (Id. at ¶ 43.)

On June 8, 2005, LR Ireland purchased a partnership interest in LRII LLP.  LR Ireland obtained the right from SSHC and Babcock, in exchange for $14,250,000, to 100 percent of the returns generated by the LRT Portfolio after payment of the AIB loan and certain specified operational expenses.  (Id. at ¶ 44.)  The CCI Policies and the "Pay First," "No Recision" and "Non-Recourse" representation on the faces of the CCI Policies were of utmost materiality and importance to LR Ireland's investment decision.  (Id. at ¶ 45.)

On June 30, 2005, Smyth, still acting on behalf of LR Ireland and AIB, learned from Marsello that Cavell and Goshawk had attempted a commutation of the CCI Policies three (3) months earlier.  (Id. at ¶ 58.)  Plaintiff alleges that SSHC and Babcock knew that if they agreed to a commutation of the CCI Policies, the June 8 transaction would never have occurred.  (Id. at ¶ 59.)

Plaintiff brought the present action against Goshawk, Kite Dedicated Ltd., Cavell, Peachtree, SSHC, Babcock, and Does 1-5 for federal securities fraud violations under Section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b), and SEC Rule 10b-5, 17 CFR §240.10b-5 (2006), along with state law causes of action for common law fraud, negligent misrepresentation, and conspiracy. On February 8, 2010, Plaintiff filed a Voluntarily Dismissal [121] of all Defendants except Defendants Peachtree, SSHC, and Babcock. The motions for dismissal by these remaining Defendants are presently before the Court. Given the overlap of the factual allegations and arguments asserted by the Defendants, the Court will address the merits of the motions simultaneously.

**II.     Motion to Dismiss Legal Standard**

When considering a FED. R. CIV. P. 12(b)(6) motion to dismiss, a federal court is to accept as true "all facts set forth in the plaintiff's complaint." Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000) (citation omitted). Further, the court must draw all reasonable inferences in the light most favorable to the plaintiff. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999); see also Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (internal citations omitted). The United States Supreme Court has recently dispensed with the rule that a complaint may only be dismissed under Rule 12(b)(6) when "'it appears beyond doubt that the plaintiff

11

can prove no set of facts in support of his claim which would entitle him to relief.'" Twombly, 127 S.Ct. at 1968 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The Supreme Court has replaced that rule with the "plausibility standard," which requires that factual allegations "raise the right to relief above the speculative level." Id. at 1965. The plausibility standard does not, however, impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." Id.

## III.  Discussion

Babcock moves for a more definite statement or, in the alternative, to dismiss based on the following grounds: (1) the Complaint is a shotgun pleading and must be replead pursuant to Rule 12(e); (2) Plaintiff's allegations do not meet the pleading requirements for securities fraud under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), and fail to plead fraud with particularity as required by Rule 9(b); (3) Plaintiff fails to allege loss causation; and (4) lack of personal jurisdiction for the state law causes of action.

In addition to the same arguments made by Babcock concerning Plaintiff's failure to meet the pleading standards of the PSLRA and Rule 9(b) regarding the actionable misrepresentations and scienter, Peachtree and SSHC raise two additional grounds for dismissal. These Defendants argue that Plaintiff's 100% economic interest in LRII LLP is not a security. Therefore, claims under Section 10(b) of the Exchange Act must fail (Dkt. No. [29] at 9.). Further, Peachtree and SSHC contend that Plaintiff LR Ireland fails to state a claim for actionable omissions because neither Peachtree nor SSHC owe any legal duty to disclose information obtained at the March 2005 meeting. (Id. at 10.)

The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504 (2007). As to the first prong, the Act requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Further, a plaintiff must "state

13

with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). "It is well established that claims of securities fraud cannot rest on speculation and conclusory allegations." Garfield v. NDC Health Corp., 466 F.3d 1255, 1265 (11th Cir. 2006).

Plaintiff's allegations center around the March 2005 meeting with Marsello.  Plaintiff alleges Marsello sought to negotiate a commutation of Goshawk and Cavell's obligations under the CCI policies and alleges, on information and belief, "that Marsello disclosed or, at a minimum, implied Cavell's and Goshawk's position that the life expectances [sic] provided by AVS were fraudulent."  (Complaint ¶ 56.)  Plaintiff alleges that by failing to disclose this meeting, Babcock and SSHC "fraudulently misled LR Ireland into purchasing their interests in the returns generated by the LRT portfolio."  (Id. ¶ 60.)

Plaintiff asserts that the allegations in the Complaint create a strong inference of scienter which is at least as compelling as any opposing inference that could be drawn from the alleged facts.  Plaintiff contends that the inference that Babcock, Peachtree and SSHC purposefully and fraudulently withheld critical information regarding the investment is stronger than Defendants'

14

contention that the communications were innocent and immaterial. (Dkt. [20] at 10.)  In support, Plaintiff cites to the complete lack of communication regarding the March 2005 meeting, despite the virtual daily contact between SSHC and Babcock representatives and Smyth. (Dkt. No. [43] at 24.)  Plaintiff contends that "[t]he much stronger inference is that Babcock [and SSHC] said nothing to Smyth about the March 2005 meeting because it knew what LR Ireland has alleged would happen- that LR Ireland would have terminated discussions of an investment." (Id. at 25; Dkt. No. [46] at 31.)

The Court finds that when viewed in their totality, the alleged facts do not give rise to the strong inference of scienter required under the PSLRA.  See Tellabs, 127 S. Ct. at 2509 ("[t]he inquiry, as several Courts of Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.").[4]  First,  Plaintiff has not sufficiently alleged

---

[4]The Court is further unconvinced that Babcock, SSHC or Peachtree had a duty to disclose the information allegedly obtained at the March 2005 meeting. Upon consideration of the six factors outlined by the court in Ziemba v. Cascade Int'l, 256 F.3d 1194, 1205 (11th Cir. 2001), the Court is inclined to find that the parties were involved in an arms-length transaction, in which the Plaintiff had full and equal opportunity to engage in due diligence and acquire any necessary information.

15

that Vance's reassurances to Smyth regarding the security of the CCI Policies or the lack of communication about the March 2005 meeting amounts to "severe recklessness," a state of mind the Eleventh Circuit describes as "an extreme departure from the standards of ordinary care" that is worse than "inexcusable negligence," and presents a danger of misleading investors that "is either known to the defendant or is so obvious that the defendant must have been aware of it." Garfield, 466 F.3d at 1264. Putting aside Plaintiff's failure to allege what was said at the meeting, to whom it was said, or in what context, the alleged facts do not support the inference that Goshawk or Cavell intended to breach their obligations under the CCI Policies.[5] The stronger inference is that in the event of a dispute, Goshawk intended to pay on the CCI Policies and pursue arbitration against Peachtree. (See Dkt. [29] at 28, 30.)

The Court finds that Plaintiff has not met the scienter requirement under the PSLRA for its claim of federal securities fraud violations under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC

---

[5]The Court further finds that Plaintiff has not sufficiently alleged what statements or omissions were made by Babcock, SSHS, or Peachtree or how such statements were misleading. See Garfield, 466 F.3d at 1262. Accordingly, the Court finds such failure further warrants dismissal of the federal securities fraud claim.

16

Rule 10b-5, 17 CFR §240.10b-5 (2006).  Accordingly, Plaintiff's claims for violation of Section 10(b) of the Securities Exchange Act of 1934 are dismissed.

Having dismissed the federal claims against Defendants, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Accordingly, the state law claims are dismissed without prejudice.  28 U.S.C.A. 1367(c) ("[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if. . . (3) the district court has dismissed all claims over which it has original jurisdiction.")  Accordingly, Babcock's Motion to Dismiss [20-1] is **GRANTED**, and the Alternative, Motion for more Definite Statement [20-2] is **DENIED, as moot**.  Life Settlements Corporation d/b/a Peachtree Life Settlements' ("Peachtree") and Senior Settlement Holding Corporation's ("SSHC") Motion to Dismiss [29] is **GRANTED**.  Plaintiff's claims are **DISMISSED** as to Defendants Babcock, Peachtree and SSHC.  The Motion to Dismiss for Lack of Subject Matter Jurisdiction [23], Motions to Dismiss for Failure to State a Claim [25] and [26], Motion for Antisuit Injunction [40], and Motions for Leave to File [77] and [78] are hereby **DENIED as moot**.

**SO ORDERED** this   9th   day of June, 2010.

_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE